Robert LeRESCHE, Commissioner of the Department of Natural Resources of the State of Alaska; and Bill D. Ward, on behalf of himself and all others similarly situated, Appellants,

v.

George H. LUSTIG, Frank Scheibl, Gilbert T. Edmonds, Robert L. Gaines, Robert E. Chace, Charles A. Edmonds and Lamond Collier, individually and on behalf of themselves and others similarly situated, Appellees.

No. 6058.

Supreme Court of Alaska.

April 22, 1983.

Shelley J. Higgins, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellants.

Wilson A. Rice, Anchorage, for appellant Bill D. Ward.

M. Ashley Dickerson, Anchorage, for appellees.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

PER CURIAM.

The Department of Natural Resources [DNR] scheduled an agricultural lottery of the Point McKenzie land parcels intending to revitalize the local dairy industry. Those interested were required to fulfill several prequalification requirements in order to participate. The DNR and the intervenors appeal from the decision of the superior court invalidating the lottery and enjoining the DNR from requiring a prelottery farm conservation and development plan from lottery applicants. We agree that the DNR exceeded its statutory authority by requiring a prelottery plan. Because of the need for expedited action we previously entered an order affirming the judgment of the superior court, noting that an opinion would follow. This opinion explains the reasons for our action.

The Point McKenzie parcels were offered at $100 per acre, well below the estimated

fair market value. Of the twenty-nine parcels involved in this litigation, seventeen were restricted for only dairy farm development. The remaining twelve could be used for any viable agricultural development.

The DNR established specific criteria to qualify for the lottery. Applicants were to demonstrate a suitable level of "training or experience" by showing either three years of commercial dairy management experience or six years of practical experience. An otherwise unqualified applicant could satisfy this requirement with proof of a contractual arrangement with a qualified farm manager. Second, applicants were required to submit a farm plan showing how they would develop any one of the parcels consistent with the DNR's clearing and planning schedule, detailed so as to be acceptable to the financing organization of the applicant's choice and a selection committee. Applicants also had to present certain financial information, and be available for personal interviews.

A three member prequalification committee evaluated the farm plans and the statements of agricultural experience. The Director of the Division of Agriculture approved, upon the recommendation of the committee, 166 out of 233 applicants. Rejected applicants were informed that they could appeal the decision to the Deputy Commissioner of Natural Resources. Of the sixty-seven rejected applicants, thirty-two sought review, and of these, thirteen obtained relief on appeal.

All plaintiffs in this case were applicants who were determined to be unqualified to participate in the lottery for the dairy parcels. George Lustig was unqualified to participate in the lottery for dairy parcels [1] because of his lack of dairy experience and because of his refusal to submit a farm plan for dairy purposes. Plaintiffs G. Edmonds, Gaines, Chace, C. Edmonds and Collier were all deemed unqualified because of their lack of commercial farm experience. The last plaintiff, Frank Scheibl, was rejected be-cause his farm plan was inadequate. Scheibl did not seek administrative relief.

On March 4, 1981, George Lustig filed a complaint seeking to enjoin the sale scheduled to occur on March 6, 1981. The court declined to issue a temporary restraining order but did order the DNR not to take any further steps to effectuate the sales contracts pending the preliminary injunction hearing set for March 18, 1981.

On March 17, 1981, the court granted a motion to intervene filed by Bill Ward, a winner at the March 6 lottery. The court later granted Ward's motion for class certification of all parties who obtained the right to purchase parcels at the lottery. At the same hearing, the court denied Lustig's motion for class certification.

At the March 18, 1981, preliminary injunction hearing, Lustig filed an amended complaint adding six other plaintiffs. The court granted the preliminary injunction stating that the DNR was without statutory or regulatory authority to require a farm plan as part of the lottery qualification process.

The DNR's motion to stay the injunction was denied March 31, 1981. We denied its petition for a stay pending a petition for review, and later we denied a petition for review.

On May 4, 1981, summary judgment was granted in favor of plaintiffs. Accordingly, the court invalidated the March 6 lottery and enjoined the DNR from requiring applicants to submit a prelottery plan.[2] The basis for the court's permanent injunction is that the State exceeded its authority in requiring a farm conservation and development plan prior to conducting the lottery.

General qualifications to participate in state land lotteries are set forth in AS 38.05.057(b). That section provides that applicants must satisfy three conditions in order to qualify to participate in the lottery: (a) an applicant must be eighteen or older;

---

1. George Lustig was found qualified to participate in the lottery for the twelve parcels not restricted for dairy development.

2. By stipulation, Lustig's claim for damages was dismissed with prejudice.

(b) an applicant must have been an Alaska resident for at least the year preceding the date of application; and (c) an applicant may not have purchased land through the state lottery within the eight years preceding the sale date.

Where an agricultural interest in state land is to be disposed of by lottery, as part of a program to develop renewable resources, the DNR is authorized to promulgate regulations which impose additional qualification conditions on lottery participants which include

skill, experience, and financial requirements necessary to qualify persons who are competent and financially able to develop the land as a successful agricultural enterprise.

AS 38.05.057(c)(3).

Here, a regulation propounded authorized requiring a farm plan after, but not before the drawing. 11 AAC 67.177 provides:

FARM CONSERVATION PLAN. (a) An approved farm conservation plan will be required as a condition of the sale. The successful purchaser must submit an approved conservation plan before consummation of the sale. For each disposal the director may accept, reject or modify the farm conservation plan after consultation with the local soil conservation subdistrict.

(b) If the successful purchaser submits an acceptable conservation plan within the time specified in the sale notice, the plan will be incorporated into the sale contract and the conveyance document as a covenant and a condition subsequent, and will be recorded in that form.

(c) If a successful purchaser fails to provide an acceptable farm conservation plan within the time specified in the sale notice, or within an extension of time granted by the director for good cause shown, he forfeits his bid deposit and the tract may be offered to the next highest bidder, or next qualified applicant, with the secondary award conditioned upon the submission of a farm conservation plan, within a time period equal to the time originally allowed.

The requirement of a prelottery plan was not authorized under this regulation.

Another regulation provided that the Director could require a demonstration of ability in farm management. 11 AAC 67.172(b)(1)–(4) provides:

(b) The director may require a prospective purchaser to qualify by providing evidence that would establish the purchaser's

(1) ability in farm management;

(2) ability to obtain financing;

(3) agricultural training and experience;

(4) net worth; ....

The DNR argues that the prelottery farm plan requirement was authorized under this regulation. We disagree. Once a successful plan was accepted by the DNR others were free to copy it since the files were public records. Several lottery "winners" copied a successful plan. Plaintiffs Gaines, C. Edmonds, T. Edmonds and Chace submitted applications with identical farm plans. All were rejected, yet not on the basis of their photocopied plans.[3] Regulations are valid only if "consistent with the statute and reasonably necessary to carry out the purpose of the statute." AS 44.62.030. The ability to photocopy the farm plan of a successful applicant does not demonstrate an ability in farm management. Thus, assuming 11 AAC 67.172(b) is to be read as requiring or authorizing prelottery plans, it is not consistent with AS 38.05.057(c), which requires any additional conditions imposed to test farming competence. Further, the regulation could not be regarded as reasonably necessary to the accomplishment of the purpose of the statute. In the words of the superior court, the prelottery farm plan requirement did not reasonably "accomplish the State's desire to verify an applicant's education, training, experi-

---

**3.** Gaines, C. Edmonds and T. Edmonds were rejected for "lack of commercial farm experience." Chace was rejected for "incomplete financial statements and lack of commercial farm experience."

ence, and equity and financing requirements, and therefore constituted an abuse of discretion." [4]

The DNR further argues that none of the plaintiffs are entitled to any judicial relief for the specific irregularity found by the superior court. Five of the plaintiffs were determined to be unqualified for the lottery on other, unobjectionable grounds—the lack of commercial farm experience. One plaintiff, George Lustig, was determined to be unqualified to participate in the lottery for dairy parcels because of his failure to submit a dairy development plan and his lack of dairy experience. Only one plaintiff, Frank Scheibl, was disqualified solely because of the inadequacy of his farm plan, and Scheibl did not take advantage of available administrative remedies.

The parties focus principally on whether Scheibl, the only named plaintiff found unqualified solely because of an inadequate prelottery plan, presents a justiciable claim. The DNR argues that "Scheibl's claim for relief against the sale is . . . subject to dismissal for failure to exhaust administrative remedies." Whether a court will require exhaustion of such remedies depends on an assessment of what benefits are obtained through affording an agency an opportunity to review the particular action in dispute. In *Van Hyning v. University of Alaska,* 621 P.2d 1354 (Alaska), *cert. denied,* 454 U.S. 958, 102 S.Ct. 495, 70 L.Ed.2d 373 (1981), we observed that " '[t]he basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special compe-

tence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies.' " *Id.* at 1355–56, quoting *Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 818, 31 L.Ed.2d 17, 25 (1972). The DNR's assertion that administrative review was particularly appropriate in this case misconceives the nature of Scheibl's complaint. Scheibl does not challenge the determination that his plan was inadequate. Such an allegation would clearly raise a factual matter peculiarly within the competence of the agency. Instead, Scheibl challenges the requirement itself. Resolution of such a claim presents a question of law which raises no factual matters and requires little agency expertise.

We conclude, therefore, that in this situation Scheibl was not required to exhaust the available administrative remedies in order to challenge the agency's action. Because there was at least one aggrieved applicant upon whom the prelottery plan requirement impinged directly, the superior court correctly granted injunctive relief.

AFFIRMED.

COMPTON, Justice, joined by RABINOWITZ, Justice, dissenting.

I disagree with the court's ruling that the Department of Natural Resources abused its discretion in requiring applicants to submit a pre-lottery Farm Conservation and Development Plan as a prerequisite to participation in the lottery. I would reverse the judgment of the superior court because

---

4. As indicated *supra* pages 2 and 3, there were three prelottery qualification requirements established by the DNR. They were, to use the terms of the DNR's qualification pamphlet (the requirements are nowhere else expressed):
   1. Education, training or experience.
   2. Farm conservation and development plan.
   3. Equity and financing requirements.

   According to the pamphlet, making a contractual arrangement for a manager who has at least a minimum of three years commercial dairy management can satisfy the education, training or experience requirement. However, such a contractual arrangement is not, under the terms of the pamphlet, a substitute for the

requirement of a farm conservation and development plan, notwithstanding the contrary suggestion of the dissent. Dissenting opinion, footnote 1. The prequalification requirements do not state, nor do they imply, that different standards will be applied to the farm conservation and development plan requirement where the applicant has made a contractual arrangement with a farm manager. If, as the dissent states, different standards were in fact applied, that does not affect our conclusion that the plan requirement was not consistent with the statute or reasonably necessary to carry out its purposes, nor does it instill a sense of confidence that the sale was fairly administered.

I believe this requirement was not unreasonable, arbitrary or an abuse of discretion.

11 AAC 67.172(b), promulgated in accordance with AS 38.05.057(c), states that "[t]he director may require a prospective purchaser to qualify by providing evidence that would establish the purchaser's (1) ability in farm management; (2) ability to obtain financing; (3) agricultural training and experience; [and] (4) net worth ...." I believe that the requirement of a pre-lottery plan was reasonable because it was designed to provide "evidence that would establish the purchaser's ... ability in farm management ...." The plan would indicate how the applicant intended to develop the farm in accordance with the development schedules set by the Department. The relevant requirements for the plan, specified in the "Point MacKenzie Agricultural Project Farmer Qualification Packet," were as follows:

> Farm conservation and development plans must be detailed so as to be acceptable to the financing organization of the applicants' choice and the Selection Committee. Farm conservation and development plans will be accepted for dairy or non-dairy farm operations. Specific farm plan requirements are:
>
> * A development schedule which results in the clearing of the land and planting of the first crops on at least 40% of the Class II and III soils within the first three years, and clearing and planting of crops on 75% of the Class II and III soils within six years. In addition, those individuals applying for dairy operations must include a stocking rate schedule to be approved by the Director, Division of Agriculture.
> * The progressive steps and time schedule for development which demonstrate

the applicants' serious intent to develop a commercially viable operation.

Applicants are required to provide verification that they had a minimum of three years of commercial dairy operation or management experience or six years of practical commercial farm experience or that they had contracted for the services of a farm manager who had at least three years of management experience. The superior court concluded that this requirement sufficiently assesses an applicant's ability to manage a farm. I disagree. As the Department indicates, the verification of experience is in the nature of information that a prospective employee would provide on a resume, while the requirement of a pre-lottery plan is analogous to the requirement of a "writing sample." The information provided by the two requirements is not duplicative and in many instances the "writing sample" is more helpful in determining the applicant's qualifications. The Department notes that the Point MacKenzie Agricultural Project "is not a simple land disposal program designed to put land into the hands of every Alaskan who is, or would like to be, a small-scale farmer. Instead, it is a major state program to promote the development of commercial agriculture generally, and the dairy industry specifically, in Alaska." The Department determined that requiring interested persons to submit a resume indicating past agricultural training and experience would not, in itself, be an adequate measure of the applicant's ability "to develop the land as a successful agricultural enterprise." AS 38.05.057(c). The requirement of a pre-lottery plan was reasonably designed to provide further information to the Department about the applicant's ability to manage a farm.[1]

---

1. The majority opinion accepts the plaintiffs' assertion that any applicant could copy a successful plan and submit it to the Department. It then states, "The ability to photocopy the farm plan of a successful applicant does not demonstrate an ability in farm management." 663 P.2d at 544–545. As the state indicates, "Three lottery winners did submit partially duplicated farm plans but those three persons qualified by reason of a farm manager

and did not try to qualify based on their own commercial farm experience and own farm management ability as did the plaintiffs." The ability of an applicant to prepare an acceptable farm plan, as an indication of his own ability in farm management, is irrelevant when the applicant is relying upon a farm manager's ability. The Department therefore did not abuse its discretion in accepting partially duplicated farm plans from applicants relying

Furthermore, the requirement of a pre-lottery plan would have fulfilled a significant purpose that cannot be fulfilled by the post-lottery requirement that an acceptable farm conservation plan be submitted by the selected applicant. An acceptable pre-lottery plan would substantially increase the probability that an applicant selected at the lottery would be able to promptly submit a post-lottery plan and accordingly be able to promptly begin work on the project. This is significant because heavy clearing work must be completed before the spring thaw. If a selected applicant is unable to submit an acceptable post-lottery plan, the parcel may be sold to the "next highest bidder, or next qualified applicant." 11 AAC 67.-177(c). This will, of course, entail delays in the commencement of work on the parcel.

Unlike the superior court, I do not believe the requirement of a pre-lottery plan "afforded the agency unfettered discretion" or was "unduly fraught with the potential for bias and favoritism." A rejection of an application on the basis that the pre-lottery farm plan was inadequate would have been subject to judicial review. The Department's rejection would be reversed if it were established that the Department had acted out of bias or favoritism or had otherwise abused its discretion. The mere fact that a statute or regulation vests discretion in an agency by no means establishes that the agency is permitted to or will abuse its discretion. I do not believe there is any basis upon which it could be concluded that the Department was more likely to abuse its discretion when approving or rejecting pre-lottery plans under 11 AAC 67.172(b) than when exercising its discretion in enforcing any other regulation.

I accordingly believe that the requirement of a pre-lottery plan was a reasonable means of establishing an applicant's "ability in farm management," 11 AAC 67.172(b), and ability "to develop the land as a successful agricultural enterprise," AS 38.05.-

057(c). I do not believe that the Department of Natural Resources abused its discretion or acted arbitrarily or unreasonably in creating and enforcing this requirement. I would therefore reverse the judgment of the superior court on this issue.

---

upon the qualifications of a farm manager. Preparing an acceptable farm plan, however, is relevant when the applicant is relying upon his own ability to manage a farm. Thus, for those applicants attempting to qualify upon the basis of their own ability and experience, as did all of the plaintiffs, the requirement of a pre-lottery plan provided further information about the applicants' ability to manage a farm.